Good morning, your honors. Can you hear me through the microphone? Yes. Thank you. Good morning, your honors, and may it please the court. My name is Dylan Jacobs. I'm the deputy solicitor general for the state of Arkansas, and I'm here on behalf of appellants. This case is about whether the Constitution requires the state of Arkansas to allow experimental gender transition procedures to be performed on children. The district court had before it hundreds of pages of medical expert evidence that discussed the uncertainty regarding these procedures, and in enjoining the SAFE Act, it didn't rely on any of that. Instead, it referenced amicus briefs filed by two trade groups, and on an erroneous view of the law, it facially enjoined the SAFE Act. This court should reverse. The SAFE Act need only satisfy rational basis review, and the district court erred in imposing any form of heightened scrutiny. To the extent that the SAFE Act discriminates, it does so only on the basis of age and procedure, and it does not distinguish by any suspect class. The procedures it prohibits are allowed once a minor reaches the age of 18, but not before that, and that easily survives rational basis review due to the identified long-term harms that these procedures can impose on children, and the existence of these harms is not seriously disputed by plaintiffs. The district court erred first in creating a new quasi-suspect class in transgender individuals. The evidence below was almost silent on the four factors under the Supreme Court's decision in Ling that go to whether a group of people ought to be recognized as a suspect or quasi-suspect class under the Equal Protection Clause. There was little to no evidence below, and the district court didn't rely on any such evidence, that transgender individuals have faced a long history of purposeful discrimination on the part of governments. Does the state seriously dispute that? I think that in establishing a quasi-suspect class, I think first it's the burden is on the plaintiffs to show that, and you know, I certainly think that in the other quasi-suspect class cases that the like City of Cleburne, you know, where you have populations that have had a history that's certainly not free of discrimination, it's not, you know, the kind of level that the Supreme Court has still gone on to create a suspect class like here, and I think it also goes to the fourth Ling factor, you know, of whether transgender individuals are politically powerless minority. Whether that may have, may or may not have been true historically, I think the Supreme Court has looked at modern conditions, at least as of the fourth factor. It did that in the City of Cleburne case, and I think the fact that, you know, the plaintiffs here, you know, have behind them, you know, a large number of medical trade groups, the weight of the federal government itself, and the Supreme Court has recently, in the Bostock case, extended, you know, civil rights protections under federal law to transgender individuals in both circumstances. You're speaking too softly and quickly for me to follow. I apologize, Your Honor. So I think that goes to the first Ling factor as well, and as to the the second and third Ling factors, whether there are immutable defining characteristics that set this population of individuals apart from the rest of society, the evidence below does not support the notion that transgender status is an immutable characteristic or gender identity, gender expression. That's what the district court found, though, correct? So this was immutable, actually said, couldn't pronounce the word, I think. The district court reached that conclusion, but again, it didn't seriously grapple or even reference the evidence that it was presented, that in particular, I think this is especially important with regard to children, in the sense of the evidence, you know, below was that the children who present with gender discongruence, gender dysphoria, in a large portion of cases, that condition will desist by the time they grow up. Isn't that a different question than whether transgendered, being transgendered, is immutable? Determining whether someone is or not is one question, of course, but whether or not it's immutable is the second question, isn't that, isn't it? I think it's relevant in the sense that the regulations here at issue only target children, and I think that it ought to at least give the court pause when analyzing, you know, the second and we've also have evidence below in the record of individuals who have detransitioned. There was testimony from, I think, three individuals below, who presented as a transgender person for many years of their lives, and then later did not. So I think there's at least some question as to that. It strikes me, counsel, you're arguing the ultimate merits, and we're here to answer that. The more you say this is all uncertain and so forth, in an evolving world, in a moving world, the more that tells me that you're not satisfying data phase. So I think at least you're not satisfying what's required to reverse a preliminary injunction under data phase. So I think, Your Honor, the uncertainty is certainly relevant to the merits, and I context goes to show why the SAFE Act satisfies both intermediate scrutiny or rational basis. And so I'll skip over part of this, but even if the SAFE Act does discriminate on a suspect class of transgender status, even if we assume that the district court was correct in recognizing this new quasi-suspect class, due to the uncertain state of the medical evidence, which I don't think can seriously be disputed, the legislature's decision to press pause on these procedures for minors. Now you've switched to, I thought you were arguing Ling for rational basis review, and now you're attacking the district court for requiring additional scrutiny. I was going to ask what case has upheld under rational basis review a government prohibition on a physician providing medical care that the patient wants, and the physician believes is consistent with his or her medical profession's obligations? So I think that out of the Supreme Court cases, I think Glucksburg probably been that. Physicians determining that assisted suicide is within the interest of their patients, and the Supreme Court there said that there's a rational basis for states choosing to prohibit that. To prohibit what? To prohibit assisted suicide procedures, which was at issue in Glucksburg. And certainly there are not bevy... That's because the suicide itself is criminal. I would argue that's maybe unconstitutional, but it's well accepted that suicide is criminal. So assisting a criminal act is a different situation than what we have here. There's nothing criminal about the patients before or after the professional services we're talking about. So I'm not sure as a general matter whether attempting or committing suicide would be a criminal act. I don't know the answer to that, Your Honor, but I think... I think assisting suicide is criminal in most states. I don't know whether it is in Arkansas or other states. I don't have that information, but I certainly think that if the prohibited nature of the procedure from an ex-ante perspective, I don't think Glucksburg is a very good example. Do you have another case? I don't... Justice Scalia thought Glucksburg was in that string of decisions where he couldn't figure out what the law was because it kept changing. I don't have any case, Your Honor, that certainly says anything other than rational basis would apply to usual regulations on professions, including... It just strikes  me as remarkable that the government could rationally do that. I think that the government could prohibit, you know, when I broke my leg at age six, the government could prohibit the traction or the surgery that the doctors thought I needed. Well, I certainly think that legislatures act with a degree of caution in regulating procedures such as that. I don't see much caution in this Your Honor, and in general, I think the practice of medicine is a very highly regulated area in multiple instances. I mean, for instance, you know, potential experimental cancer drugs that are life-saving, you know, still have to be approved by the FDA in most instances, and I don't think... What about, doesn't Arkansas have, is it called a right-to-try statute for those kinds of situations? Do those, can children get those in Arkansas? I don't believe that there's any distinction, any age distinction in those statutes. So that's actually an example where Arkansas allows what you've described as sort of experimental medication or treatment. That's correct, Your Honor, and I think that that's a justified policy distinction, even when we're dealing with intermediate scrutiny, in the sense that the benefits of cancer treatment are, I thought, but you're focusing, you shifted to benefits, but the idea of an experimental treatment, if it hasn't been approved, is presumably that there could be some risks as well. So in that instance, you're focusing on the potential benefits, and in this one, you're focusing on the potential risk. Why wouldn't you look also at the potential benefits that, you know, the district court got evidence that there were children who truly did benefit from this, based on the advice of their physicians, as well as the counsel of their parents? So I think you do have to look at both risks and benefits in tandem, and here the legislature was concerned with both, in the sense that there are identifiable permanent long-term risks associated with these gender transition procedures, and the evidence of benefit for children hasn't been established, whereas... There's a lot of long-term risks in chemotherapy, too. Well, there certainly are, Your Honor, but... And all other kinds of experimental, you know, not all, in many experimental medical procedures. Well, and there certainly are, and those have to be weighed against the potential benefits of... The government is not partied away, it's the physician. Well, I don't think that's right, Your Honor, in the sense that the legislatures, you know, are the ones vested with authority to make policy-making decisions to regulate the medical practice. Providers of medicine or any other profession have not historically had some... So the legislature can decide that there's too many long-term risks from cleft palate surgery, and they're prohibited? I think if the legislature had a rational basis to do that, then as a policy matter and under the state's police power... I don't hear anything more rational than, well, there's long-term risks. Well, in that case, there may not be, you know, that the assess whether there's a rational basis on that. And I think the fact that legislatures, you know, are very circumspect in enacting the kind of prohibitions that the legislature enacted here, you know, goes to show that they take this seriously. And I think that, you know, the evidence is they took it seriously in this case as well. And I think that the procedures at issue here, these gender transition procedures, you know, can be set apart from many of those long existing practices like cleft palate surgery, you know, because they are a very emerging area of medicine. They haven't... Counsel, can I ask you, and I apologize, I'm gonna pivot a little bit and perhaps get a small amount more toward the merits that Judge Loken correctly talked about are not front on our list, but I want you to explain to me the line that you're drawing in the First Amendment issue. You're suggesting that the law prohibits referrals but not speech. And so, is that correct? Am I correctly describing your position? I think our position is if the referral prohibition impacts speech, it does so only incidentally as part of a regulation of the practice of medicine. So do you believe that the statute would prohibit, for instance, a doctor from sitting down with a patient and their family and describing in great detail why a doctor in a neighboring state would be a perfect specialist for this sort of care and how to contact that doctor, but not making a in-the-computer-system referral? Would that be prohibited? I think probably. I think sort of making an assessment as a physician of, you know, whatever treatment is medically appropriate for one's patient and acting either in concert or, I think in Your Honor's hypothetical, sort of directed at another specialist in the area who could provide the treatment that the physician is assessing that is in the best interest of the patient. I think that is part of the core practice of medicine. But isn't that the core nature of speech? The patient and his doctor speaking about the condition and possible treatments? I'm having a hard time understanding how you can say this isn't a prohibition on speech just because it's a prohibition on referrals. I mean, I think that the Supreme Court has distinguished between, you know, these kinds of prohibitions in the sense of, you know, certain regulations that may, just as a practical matter, restrict speaking in some way or another, that those regulations are a regulation of a professional's, you know, conduct within their profession. I think something like the no-contact rule for attorneys would be another example of not contacting a person who's represented by another lawyer and speaking to them. That is certainly a restriction on speech. But I don't think anyone would think that that's a First Amendment issue. And I think that, for the same reason, it's, you know, not a First Amendment problem to restrict, you know, conduct of a provider. Could a doctor call another doctor in another state that the Arkansas doctor thinks his or her patient may be going to and say, don't do this transition treatment, this gender transition treatment? I don't think that that would fall under the ordinary meaning of the word referral. So you can call another doctor to say, don't accept this patient for this treatment, but you can't call another doctor to say, please accept this patient for this treatment. Again, I don't think that would be covered by the statute, Your Honor. So a doctor could do that? I don't think that would be a referral for the purposes of a gender transition procedure under the statute. If I could reserve the balance of my time for rebuttal, Your Honors. I don't see referral defined. Is it defined in the statute? I don't think the statute defines it. I think the ordinary meaning of that term in the context of the practice of medicine, you know, referring a patient would be done only in anticipation that the referee provider would be doing something for that patient. So it would prohibit referring to a physician in the state that does not have Act 626? The Act does not contain any restriction on the location of the referee physician, Your Honor. And how is that constitutionally rational? Under rational basis, I think that survives because if, assuming that the legislature is allowed to prohibit these procedures, it's perfectly rational to close a loophole. Strikes me as a clearly, an arguably invalid extraterritorial effect. It might well pose a dormant commerce clause problem, Your Honor. That's not a case that, or that's not a claim that's before the court. And so I don't think the court has to decide that issue. I mean, okay, so you're saying the plain meaning of referral is Arkansas is prohibiting Arkansas citizens from going anywhere in the world on the advice of their doctor to have these procedures? So the referral prohibition doesn't operate on the patients. It solely regulates the conduct of the doctor. So the patients are free to travel to another state and... So the patient who wants to go to Texas has to sort it out for himself or herself. Because you can't get any help from your Arkansas physician who will otherwise go to jail or be disbarred. That is the regulation, Your Honor, in the sense that if Arkansas is allowed to prohibit... And that's rational. I think that's perfectly rational, Your Honor, that if the legislature would like these procedures to not happen... That's a rational impact on Arkansas citizens. Well, again, we think that the prohibition itself is rational and assuming that... No, the prohibition is on referral here. Well, again, if the prohibition on the procedure... Referral to Vienna. Again, if the prohibition on the procedures themselves is rational, and we argue that it is, then it's also rational to take proper steps to prohibit those procedures from being performed on Arkansas citizens. To make sure that Arkansas's prohibition affects its citizens all over the world. I see my time's expired, Your Honor, but I do think it is rational to ensure that the prohibition is not easily avoided by these sorts of referrals. Thank you, Your Honors. Thank you. Ms. Strangio? Oh, we have time. Good morning, Your Honors. May it please the Court. My name is Chase Strangio, and I represent the plaintiffs. When Arkansas categorically banned all medical treatment for adolescents with gender dysphoria, it put Dylan Brandt, Sabrina Jenin, Parker Saxton... You're going to have to speak up for me. Sorry, Your Honor. ...and their families at risk of serious and irreparable harm. The district court did not abuse its discretion when it preliminarily enjoined the ban, simply returning the parties to the status quo which had existed in Arkansas for many years. Why isn't the injunction too broad? Because it's the whole statute. Your Honor, I don't believe the district court abused its discretion in enjoining the law. It had discretion to consider the unconstitutional applications of the law and had a record before it in which it determined... That wasn't my question. I asked you a Federal Rule of Civil Procedure 65 question... Well, Your Honor, I believe... ...which mandates that an injunction be no broader than necessary. Well, for a few reasons. I think it's necessary given the equal protection violations to the individual plaintiffs, which included the adolescent plaintiffs, their parents, and their doctors who have standing to challenge the law in its entirety because of the unequal treatment that they were subjected to. I'm going through the statute, and there's a lot of stuff in there that is not by any means irrational. So why doesn't the court have an obligation to selectively prohibit its enforcement on a preliminary basis? That's what a circuit law requires. Well, I think looking at the Supreme Court's decision in Patel, I think the relevant question is, you know, the group of people for whom the law is a restriction, not the group of people for the... Say that at what? In the case of Patel and Casey as well, the relevant question is the group of people for whom the law is a restriction, not for whom the law is irrelevant. As I understand... You're either not understanding or completely ducking the question. I'm talking about specific provisions, do's and don'ts, in the statute. And when we talk about no one under 18 can have this particular kind of surgery, I understand the breadth of that. But there's some other things in here that are not nearly that broad, and I don't see any attempt by the district court to do its rule, and maybe the parties didn't... Nobody argued it. The court had my... In precedent I've authored, the court had an obligation to do it itself. So, I mean, I think when it comes to the operative prohibition in the statute, which is the prohibition on the administration of gender transition procedures, which includes the various forms of treatment that the plaintiffs challenge in this case, that it was proper for the district judge to enjoin those provisions of the law, which impose the unique harms... All right, so what provisions are those? And you're willing to have us modify the injunction? Limited to what provisions? Well, Your Honor, I think... What provisions do you think are critical to your overall position? I think the operative, the most critical provisions are 20-9-1502, which are the prohibition of gender transition procedures for minors, which is the categorical ban which subjects the plaintiffs to unequal treatment and infringes upon the fundamental rights of parents. Those are the... That would be the prohibition. And then the enforcement provision, which because we have sued the government officials charged with enforcing that operative provision of the law, that it was proper for the district court to enjoin the government officials charged with enforcing the law that has caused the unique and particular harms to the individual plaintiffs, that the judge made factual findings to that effect. I don't think it was an abuse of discretion for the judge to enjoin those operative provisions of the law. We're also here on the preliminary injunction and we're... Can I ask a question related to what Judge Loken was inquiring? So you've identified the prohibition on the treatments portion as something that is particularly appropriate, in your opinion, for a more tailored injunction and enforcement. Do you believe that if that part of the law were enjoined and the private cause of action were allowed to stand, that there would be anything to have a private cause of action regarding during the pendency of this litigation? Well, Your Honor, I think with respect to the private cause of action, we've sued the government officials. So to the extent that the government officials had a particular role with the private cause of actions, then they would be enjoined as to those private causes of action. I think if the court were to determine that the law was unconstitutional or likely to be unconstitutional, as I believe the district court properly held, then it would be a question in a separate proceeding of precedential value of the court's determination. I think it would be... We don't do things for a precedential value. I don't believe Article III allows us to. Well, Your Honor, as I understood the question, it was, would a separate set of parties who are not before the court in this matter be bound by the injunction? I think the answer to that question is no. Would it have an impact on those parties? I think most likely if the whole basis for their cause of action was this particular statute that Arkansas passed, which we submit is unconstitutional for the reasons that the district court properly held. So if I understand the question, it's how are separate parties impacted. I think they're impacted by the ultimate decision as anyone would be, and they could bring a cause of action under a totally different provision. If their cause of action was pursuant to the SAFE Act itself, I don't think that they would necessarily be enjoined by the injunction that runs against the government defendants, which, again, I believe is proper. We're also set to go to trial in four months in which all of these questions are going to be tested, and the court will issue a final injunction one way or at least consider the full merits of the case. Returning, if I may, yes, of course, Your Honor. Can I ask one more question about this same issue, I hope? Talking about the scope of the injunction and, frankly, the question of standing, which is obviously separate, one of the things that opposing counsel has argued is that because none of the named plaintiffs describe any intention, in fact, disavow an intention to participate in surgical procedures before they are 18 or at least gender transitioning surgical procedures, that there is no standing as to that portion of the law and, therefore, the injunction shouldn't extend to that portion of the law. What's your response to that argument? So two things, Your Honor. The first is that the operative prohibition itself in 20-9, 1502 subsection A, prohibits gender transition procedures without separately enumerating them. The definition section separately enumerates them, but with respect to the injunction, it's as to that provision itself. And so I believe that the plaintiffs have adequately showed that they have standing to challenge that provision. They are currently receiving care or anticipate receiving care and so have standing to challenge that operative provision of the statute. And then the second reason is that they have alleged unequal equality violations in the statute itself. So they have standing to challenge the unequal treatment that they've been subjected to, which I think Northeast Florida Chapter is a helpful and instructive case in this respect, which is that the Supreme Court has held that being subjected to unequal treatment itself confers standing. And so in that sense, they have standing to challenge the entire scheme that treats them unequally because of their trans status and because of their sex. And so they have standing to challenge all of those aspects of the operative provision and the injunction was proper. The district court did not abuse its discretion in that respect. So turning, if I may, to the class of- You said trial is scheduled in four months? Yes, Your Honor. We are set to go to trial in October. What's the likelihood of that? Is that just when the standing order was initially entered? No, Your Honor. We've been in discovery. We've completed discovery as of last week. We have motions. We have Daubert motions and other motions due on Friday of this week, and we are very much ready and prepared to go to trial in October, which I expect will happen. So considering the equities- When's the last time a Daubert motion was resolved in four months? Well, Your Honor, we have expeditiously resolved all of the discovery motions. We have resolved motions to compel. I believe that we will have an expeditious resolution of the summary judgment motions should they be filed. What's the irreparable injury in the next four months? Well, the irreparable injury is that you have- The record has shown that the unrebutted testimony of the individual plaintiffs is that they have relied on this treatment. It has been beneficial for them. The status quo was that they were receiving this care, that doctors, parents, and patients were able to work together to provide individualized treatment plans for adolescents who need them. This injunction has now been in place for almost a year. People have been receiving treatment in Arkansas for years. People are relying on this treatment because of this injunction. The plaintiffs have been able to receive the medical care that they need. If the injunction were lifted now, these families would have to leave their homes, their communities, their jobs, travel to another state just to potentially return at the point where a final order would be issued, potentially as soon as October of this year. Was there evidence on what harm would come from a delay, sort of stopping the treatment, waiting four, five, six months to start back up again? Was that in the record? Yes, Your Honor. So the expert testimony of Dr. Atkins, who is an endocrinologist and a clinical expert in this treatment, talks about how even removing treatment for a short period of time could cause young people to undergo their endogenous puberty and have physical changes that would be impossible to potentially undo. As well as even just the passage of the act itself, Dr. Hutchison, who is a plaintiff in this case, testified in her declaration that even the passage itself led to multiple suicide attempts of adolescents just based on the fear of losing their treatment. And in this case, the individual plaintiffs talk about how afraid they are of going back to a time when they did not have access to this treatment, a time when they were living in bodies that were causing them significant distress. And their parents talked about how painful it was to watch their adolescent children suffer. The individual parent plaintiffs explained that if their adolescent children were to lose medical care, even for a period of a day or a week, that they would have to leave their homes. And that's all in the record. And the judge made factual findings that there would be serious mental and physical health consequences to the individuals if this law were to go into effect. And if I could respond to just a few things that my colleague said with respect to the experimental nature of the treatment. So I think two things, one factual and one legal. Defendants' arguments in defense of this law rely first on a mischaracterization of the underlying science and what was before the court on the record in this case. But what was before the, one thing I'm grappling with on this, hopefully this precise question, is what we're supposed to do with the legislative findings. So you talk about the record before the court supporting the injunction, but we have legislative findings that talk about the dangers and risks and experimental nature, and the legislature took testimony, and there's explicit findings of the legislature in this case that are very different from the information that was received by the court. Why isn't it within the legislature's purview to take the findings here, the evidence, and make this decision? And if it's not, what should we do with that record? Well, Your Honor, I think one of the hallmarks of heightened scrutiny under the Equal Protection Clause is that the court does not uncritically defer to legislative findings, and it is, in fact, the role of the court under heightened scrutiny to look at the justifications. What's the case where that's specifically discussed? Your Honor, in United States v. Virginia, in Morales-Santana, both the recent, well, obviously Virginia's not that recent anymore, I've lost track of time altogether, but Morales-Santana, United States v. Virginia, talks specifically about how in heightened scrutiny that the role of the court is to look critically at the justifications put forth by the state and not to defer uncritically to those findings, both the legislative findings, as well as the arguments put forth by the state during litigation. And, in fact, the court has made clear that under heightened scrutiny, that the court is charged with looking at the actual purpose of the law, looking behind the legislative findings and understanding the reasons why the law was passed and making sure that the state has put forth a justification and that the line that they've drawn is substantially related to that sufficiently. It strikes me that trying to determine legislative intent, which has been criticized by the Supreme Court far more often than encouraged, but even if it's sound, you don't do that at a preliminary injunction stage. What Supreme Court cases said, a preliminary injunction was valid because of the plaintiff's suspicion about the actual legislative intent we agree with. Your Honor, I'm sorry if I misspoke to suggest that it was the role of the court to discern legislative intent. Rather, what I meant to say so that was it. That's what lawyers say to us all the time. Well, I think in this case the question is, do the justifications substantially relate to a sufficiently important governmental interest and that deferring to the legislative findings is not the proper role of the court under heightened scrutiny? And that's clear in the heightened scrutiny equal protection case. But that wasn't Judge Menendez's question. She wasn't saying, you know, you have to defer. She was saying, why isn't it relevant? Why are you arguing just on the basis of the medical record before the court and disregarding entirely the legislative findings? Well, Your Honor, I think then the question is. I'll bet Virginia and Morales don't encourage that. I think the question then is, did the district court first, were the findings of the district court clearly erroneous in light of the record that the court considered, which presumably included, as he detailed, during the course of the preliminary injunction hearing, all of the things that he reviewed, including the statute and the substantial record before him, were the findings that he made at this preliminary stage clearly erroneous. And I don't believe that they were. So in that sense, it's part of the record. But it is not something that the court defers to uncritically. And in this case, you have substantial evidence in the record showing the significant benefits to the individual plaintiffs in this case, who the defendants don't even mention at any point, not to mention rebut the testimony that they have put forth about how this medical treatment benefited them, as well as the testimony of experts talking about the many studies documenting the benefits, the mental health benefits, of this prescribed treatment. And therefore, the judge's finding that this treatment benefits many people was not clearly erroneous at this stage in the proceedings, at this preliminary injunction, to determine that plaintiffs were likely to succeed on the merits of their claims. And even accepting, sort of taking a step back and looking at the entirety of the case that the defendants have put forward, at best what we have is the suggestion- I have to stop you. I don't see a section of the district court's order that says findings of fact. Your Honor- As I understand it, there wasn't all that much of a hearing, is there? The submission of a bunch of documentary evidence, affidavits, and studies. So where is this clearly erroneous standard emerging from that order? Your Honor, he didn't enumerate them as findings of fact in a separate provision of the opinion. He did not- Excuse me, Your Honor. He did not enumerate them in a section entitled findings of fact. So how do we sort them out? Where is the finding and where is the tentative conclusion? I would submit that it's the places where he said, based on the record before me, I am making a finding that- Did he ever use the word finding in his order? He did, Your Honor, in two different ways. And there's two aspects to the order. There was the- There's a different way. There's the- There's the word. So there's the oral order that happened at the hearing, and that's beginning at joint appendix 1066 to 1068 is the judge's analysis of the record. And that is in the joint appendix. That's the transcript of the hearing explaining what he considered and how he considered it. At the end of the transcript, and that would be at joint appendix 1123, he makes specific findings. He says, for purposes of the preliminary injunction record, having considered the evidence, for example, I find that trans people have suffered a history of discrimination. And to your point earlier, Judge Kelly, he then went on to find as to the four considerations with respect to finding a suspect classification that he made findings as to those four considerations. In his written order, which is in the addendum, primarily on pages 8 and 9, he makes specific findings saying, I find that the individual plaintiffs will suffer physical and emotional harm if they have this treatment withheld. That's in the irreparable harm analysis and is enumerated and listed in his written order. I think both of those things are clearly part of the district court record that this court would review for clear error. But even if this court were to review the entirety of the record de novo, I think it plainly supports the district court's ultimate findings, which is that the plaintiffs are likely to succeed on the merits of their claim, that this is medical care. That's not a finding. Well, Your Honor, I was saying even if you were to review the record de novo, I think it ultimately shows that plaintiffs are likely to succeed. And taking a step back, which I think goes to some of what we were getting at earlier, and I see I'm almost out of time, and so I'll try to wrap this up very quickly, which is to say at best what we have from the defendants is the argument that there is some uncertainty, that there are some questions about diagnosis, but they have not explained why categorically banning this care and this care alone substantially advances an important governmental interest. And as this case is very shortly to proceed to trial, we respectfully ask that this court affirm the district court's preliminary injunction and maintain the status quo pending trial. Thank you, Your Honors. Thank you. Thank you, counsel. Time has expired? Time has expired. Very good. The case has been thoroughly briefed by the parties and many others, and it's been very helpfully argued this morning, and we'll take it under advisement.